UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| LOST KEY PLANTATION LIMITED PARTNERSHIP, | ) ) | Case No.  6:02-bk-11497-KSJ Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| WCI COMMUNITIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 6:04-ap-156 |
| vs. | ) | |
| | ) | |
| RODERIC M. WRIGHT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM OPINION
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

The plaintiff, WCI Communities, Inc., and the defendant, Roderic M. Wright, have filed cross motions for summary judgment contending no material factual disputes exist.  The sole legal issue is whether the res judicata effect of the order confirming the debtor's plan of liquidation bars Wright from continuing with a state court lawsuit filed against WCI, who purchased real property from the debtor under the confirmed plan.  For the reasons stated in this opinion, the Court holds that the Confirmation Order does not bar Wright's lawsuit finding that his claim does not arise out of the same nucleus of operative facts considered by the Court during the confirmation process.

The debtor, Lost Key Plantation Limited Partnership, was the owner of a large and valuable parcel of real property located in Perdido Key, Florida, which was largely undeveloped with the exception of an operating golf course (the "Property").  In July 2001, Wright

approached the debtor's principals about brokering the sale of the Property. On September 4, 2001, the debtor executed a Finders/Brokers Agreement in which the debtor agreed to pay Wright a 10 percent commission if he were able to procure a sale of the Property for at least $34 million.

In his capacity as a real estate broker for the debtor, Wright met with Dwight Thomas, a representative of WCI, to encourage the company to buy the Property. At this meeting on August 21, 2001, Wright required Thomas to sign a document entitled Non-Disclosure/Non-Compete Agreement (the "Confidentiality Agreement"), before providing certain information about the Property to him. (Wright is relying upon the terms of this Confidentiality Agreement in his current lawsuit against WCI.) However, back in 2001, WCI expressed absolutely no interest in buying the Property.

Wright, not one to give up a sale, met with Thomas and another WCI representative, Joe Corelli, a second time on October 8, 2002. Wright again made a sales presentation to induce WCI to purchase the Property. Again, WCI declined.

Because the debtor was unable to pay its operating expenses and due to an imminent foreclosure of the Property, the debtor filed this Chapter 11 case on October 21, 2002. Wright continued with his efforts to sell the Property, again contacting Thomas, now at a new job after leaving WCI's employment on December 2, 2002. Nothing came of these discussions.

However, Wright was successful in convincing another buyer, Lee Maher of Unicorp National Development, to purchase the Property. On February 21, 2003, after a complicated series of further negotiations, the debtor signed a purchase agreement with Maher's designated purchasing entity, Lost Key Resort ("Resort"), to buy the Property for $18,250,000. Further, as part of the purchase agreement, Resort and the debtor agreed that Wright was to receive a 3.3

percent equity interest in Resort.[1]   In addition to this equity interest, Wright also was entitled to a broker's commission of $250,000, plus a participation fee of up to $150,000 based on future events.  Wright filed an application with the Court to be retained as a broker and to be paid his commission in connection with this sale (Doc. Nos. 141 and 143).

Resort's purchase agreement was the cornerstone of the debtor's Chapter 11 liquidation plan.  The sale was to close on May 28, 2003, in conjunction with the scheduled confirmation hearing on the debtor's plan.  At the confirmation hearing, counsel for Resort advised the parties that his client could not go through with the purchase.  Wright also attended this hearing on behalf of Resort. Wright addressed the Court at length regarding Resort's failure to close on the purchase.  Because this sale was the sole means of implementing the debtor's plan, the Court denied confirmation of the plan.  More significantly, the debtor's exclusivity period expired.

In the ensuing months, six different entities filed proposed reorganization plans to acquire the Property,[2] leading to difficult procedural issues regarding soliciting votes for so many competing plans.  One plan proponent was Perdido Key Realty, LLC.  This was a limited liability company created by a company known as Strategica as a vehicle to acquire the property.

Wright was intimately involved with Strategica.  Wright had contacted Strategica about purchasing the Property.  For Wright's efforts, Strategica also promised him an equity interest in the purchasing entity, Perdido Key Realty.  On August 20, 2003, the Court conducted a hearing to sort through the six plans and determine which plan, if any, would be sent to creditors for

---

[1] As part of its strategy to obtain the Property, Resort also purchased from AmSouth Bank, one of the debtor's secured creditors, the mortgage debt encumbering the Property.  Thus, Resort was both a proposed purchaser of the Property *and* a secured creditor in the bankruptcy case.  Wright certainly was aware of Resort's acquisition of AmSouth's debt, if, indeed, he was not the person orchestrating the purchase.

[2] Once the debtor's exclusivity period expired, several parties in interest filed their own plans in attempts to acquire the Property.  On June 18, 2003, Pinnacle Communities, LLC filed its plan (Doc. No. 173); on June 23, 2003, Champion filed its plan (Doc. No. 175); on August 8, 2003, Perdido Key Resort Development Company, LLC filed its plan (Doc. No. 217); on August 8, 2003, Perdido Key Realty, LLC filed its plan (Doc. No. 220); on August 8, 2003, the debtor filed its Second Amended Plan of Reorganization (Doc. No. 222); and on August 8, 2003, Advocate Investments, LLC filed its plan (Doc. No. 224).

consideration.  Attorney Nick Bangos represented Perdido Key Realty at this hearing.  The Court deferred ruling on which plan(s) would be sent to creditors and scheduled a follow up hearing to occur on August 25, 2003.

Wright also attended the hearing on August 20, 2003.  At this hearing, Wright first learned that WCI was a potential purchaser of the Property pursuant to the plan submitted by the debtor's limited partner, Champion Management Development Company, Inc. ("Champion").  After the hearing, Wright had a conversation with WCI's attorney, John Anthony, in which Wright advised Anthony of his Confidentiality Agreement with WCI.

By August 2003, both Thomas and Corelli, the two WCI representatives who had spoken to Wright about the Property, had found new jobs.  There was no one then employed by WCI who had any knowledge of the Confidentiality Agreement or Wright's involvement in the Property.  Rather, Champion negotiated with WCI representatives who had never met Wright and had no information regarding the Property.  On August 22, 2003, Wright sent Anthony a copy of the Confidentiality Agreement.  Wright also wrote a letter to Perdido Key Realty's attorney, Bangos, enclosing a copy of the Confidentiality Agreement, expressing his belief that the Confidentiality Agreement created "severe heartburn" for WCI, asking Bangos to respond to WCI's counsel, and stating that he intended to attend the next hearing scheduled for August 25, 2003.  By his own correspondence, Wright knew that WCI was attempting to acquire the Property from the debtor.  Further, by August 22, 2003, WCI's current management also had actual knowledge of the terms of the Confidentiality Agreement.

At the hearing on August 25, 2003, the Court determined that only two plans would be sent to creditors—the plan proposed by Champion, which the debtor later supported and which proposed WCI would purchase the Property, and the plan proposed by Advocate Investments, which contemplated a public auction of the Property.

Champion then joined forces with the debtor's general partner to file a Third Amended Plan which proposed a cash sale of the Property to WCI for $25 million. Wright had knowledge of the plan and WCI's purchase offer.

The debtor also was aware of the existence of the Confidentiality Agreement between WCI and Wright well prior to the confirmation hearing. On September 26, 2003, Bangos sent an e-mail message to the debtor's attorney advising him of Wright's Confidentiality Agreement with WCI and specifically threatening to file an action for injunctive relief to stop the sale to WCI. Bangos also wrote to Jay Enis, a principal at Strategica, and informed him of Wright's Confidentiality Agreement and recognized that enforcing the agreement would require "break-neck speed" in the needed litigation. Clearly, Bangos recognized that immediate litigation was needed under the Confidentiality Agreement, in order to stop the sale to WCI. However, neither Wright nor Strategica hired Bangos or any other lawyer to pursue this litigation or otherwise to challenge WCI's purchase of the Property.

On October 9, 2003, the Court held a confirmation hearing to consider the competing plans. Significantly, no one, including Perdido Key Realty, the debtor, or WCI, referenced the Confidentiality Agreement or intimated that the Confidentiality Agreement was relevant to the confirmation process. At the conclusion of the hearing, the Court confirmed the plan and approved the sale of the Lost Key Property to WCI. In the written order, the Court made a specific finding that WCI was a "good faith purchaser of the debtor's property through the Purchase Agreement pursuant to Section 363(m) of the Bankruptcy Code" (the "Confirmation Order") (Doc. No. 287). The debtor and WCI promptly closed on the sale of the Property for $25 million resulting in a 100 percent payment to the debtor's creditors and a substantial distribution to equity holders.

Much later, on June 1, 2004, Wright sued WCI in Escambia County Circuit Court alleging that WCI breached the Confidentiality Agreement by purchasing the Property from the debtor through the plan. Wright recently has amended his complaint to include a claim for unjust enrichment. Wright is seeking only monetary damages and is not seeking to undo the sale.

WCI now claims shock at this belated litigation contending that, pursuant to the legal theory of res judicata, the Confirmation Order barred Wright from suing WCI for additional monies in connection with the purchase of the Property. WCI moved to reopen the case, which was granted,[3] and then filed this adversary proceeding. WCI now seeks a declaratory judgment that the Confirmation Order bars the continuation of the state court lawsuit filed by Wright and that Wright waived whatever rights he may have against WCI by failing to raise his claims prior to confirmation of the debtor's plan of liquidation.

Wright, in response, argues that res judicata does not apply. Wright argues that the Court never considered WCI's liability under the Confidentiality Agreement in entering the Confirmation Order and that his claims simply are not relevant to the approval of the sale of the Property. Wright never sought to stop the sale. He just seeks monetary damages from WCI for violating the terms of the Confidentiality Agreement, an agreement between only WCI and Wright.

Both WCI and Wright now seek summary judgment as a matter of law (Doc. Nos. 114 and 124). Pursuant to Federal Rule of Civil Procedure 56, which is applicable under the Federal Rule of Bankruptcy Procedure 7056, a court may grant summary judgment where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

---

[3] The Order Granting Motion to Reopen Chapter 11 Case was entered on June 30, 2004 (Doc. No. 357 in the Main Case).

law." Fed. R. Civ. P. 56. The moving party has the burden of establishing the right to summary judgment. Fitzpatrick v. Schlitz (In re Schlitz), 97 B.R. 671, 672 (Bankr. N.D. Ga. 1986). In determining entitlement to summary judgment, a court must view all evidence and make all reasonable inferences in favor of the party opposing the motion. Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).  Therefore, a material factual dispute precludes summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  As summarized above, the parties submitted stipulated facts for the Court's consideration in connection with their Motions. No material factual disputes exist, and the one remaining legal issue is ripe for resolution on summary judgment.

The sole legal issue is whether, pursuant to the principles of res judicata, the Confirmation Order and its holding that WCI was a good faith purchaser of the Property bars Wright from suing WCI in Florida state court for breach of the Confidentiality Agreement and for unjust enrichment.  The Eleventh Circuit Court of Appeals has issued three significant opinions, two in the last year, which addressed the issue of when a confirmation order entered in a bankruptcy case bars non-debtor parties from later proceeding with litigation in non-bankruptcy forums, Daewoo Motor America, Inc. v. General Motors Corp., 459 F.3d 1249 (11th Cir. 2006), Eastman Kodak Company v. Atlanta Retail, Inc. (In re Atlanta Retail, Inc.), 456 F.3d 1277 (11th Cir. 2006), and Kaiser Aerospace and Electronics Corp. v. Teledyne Industries, Inc. (In re Piper Aircraft Corp.), 244 F.3d 1289 (11th Cir. 2001).  In each of these cases, the appellate court focused on the individual and unique facts involved to determine if the earlier and later actions "involved the same nucleus of operative fact, or [are] based upon the same factual predicate." Piper Air, 244 F.3d at 1297.

Although the crux of the legal test is the same in each of these three cases, i.e., that an identity of "operative facts" bars later litigation on the same facts, the legal theory varies. In Daewoo, the case raised issues of international comity, which are not relevant here. However, in both Piper Air and Atlanta Retail, the Eleventh Circuit Court of Appeals applied a traditional res judicata analysis addressing the effect of a bankruptcy court's confirmation order.

Without dispute, an order confirming a plan in a Chapter 11 case constitutes a final judgment on the merits for res judicata purposes. A plan is binding upon all parties once it is confirmed and "all questions that could have been raised pertaining to the plan are res judicata." In re Grubbs Const. Co., 328 B.R. 873, 879 (Bankr. M.D. Fla. 2005): In re Harloff, 247 B.R. 523 (Bankr. M.D. Fla. 2000); *see also*, In re Justice Oaks II, Ltd. 898 F.2d 1544 (11th Cir. 1990), *cert. denied*, 498 U.S. 959 (1990). However, res judicata only bars those claims that actually were raised or which could have been raised during the bankruptcy proceeding. The issue then becomes what is the limit of the res judicata effect of a confirmation order entered by a bankruptcy court.

Res judicata "is a judicially made doctrine with the purpose of giving finality to parties who have already litigated a claim and promoting judicial economy; it bars claims that could have been litigated as well." Atlanta Retail, 456 F.3d at 1284 (citations omitted). In order to establish res judicata, *each* of four factors must be present:

1. The prior judgment must be valid, rendered by a court of competent jurisdiction, and in accordance with the requirements of due process;

2. The prior judgment must be final and on the merits;

3. The prior litigation must involve the same parties or their privies; and

4. The later litigation must involve the same cause of action as involved in the earlier proceeding.

In Atlanta Retail, as in this case, there was (and is) no issue that the bankruptcy court was competent to enter the confirmation order or that the confirmation order was valid and final. Nor was the focus of the analysis based on the similarity of identity of the parties between the earlier litigation in the bankruptcy court and the later litigation in a non-bankruptcy forum.

Rather, in Atlanta Retail, as well as in this case, the only issue is whether the later litigation involved the same operative facts as those that were actually raised or that could have been raised in the earlier litigation. The key analysis is whether the two legal actions "involve the same nucleus of operative fact, or [are] based upon the same factual predicate." Piper Air, 244 F.3d at 1297; Ragsdale v. Rubbermaid, Inc., 193 F.3d 1235, n. 8 (11th Cir. 1999). In making this determination, a reviewing court must consider not only those factors directly raised by the parties but also all factors that the initial court necessarily considered in rendering its decision. Atlanta Retail, 456 F.3d at 1288-89.

Because it is exactly this test that the Eleventh Circuit Court of Appeals applied to very similar procedural and factual issues raised in Daewoo, Atlanta Retail, and Piper Air, this Court is rightfully guided by those decisions. In Daewoo, the appellate court found a sufficient similarity between the operative facts to bar claims raised against non-debtors in later litigation. However, in both Piper Air and Atlanta Retail, the court found no such similarity of facts and allowed the later filed litigation to proceed.

In Daewoo, the later lawsuit involved two non-debtor entities following the Korean bankruptcy reorganization proceedings of Daewoo Korea. The debtor, Daewoo Korea, manufactures Daewoo automobiles. Daewoo America, a subsidiary of Daewoo Korea, was the exclusive distributor for Daewoo Korea's cars in the United States. Daewoo America never filed bankruptcy but actively participated in the Korean bankruptcy of its parent company. In connection with this foreign bankruptcy, Daewoo Korea entered into an agreement with General

Motors Corporation ("GM") in which GM would acquire Daewoo Korea, build new Daewoo cars, and control the future distribution rights of these vehicles.

Obviously, this agreement directly affected Daewoo America's future business. Daewoo America was fully informed about the terms of this new arrangement and, although Daewoo America's attorneys informed GM's attorneys that the new agreement violated Daewoo Korea's existing distribution agreement and would lead to litigation, Daewoo America did not object to the confirmation of Daewoo Korea's modified plan of reorganization, which was based exclusively on the debtor's agreement with GM. The Korean bankruptcy court confirmed the debtor's agreement with GM and the modified plan of reorganization. GM bought the debtor and later announced, not surprisingly, that GM, not Daewoo America, would begin selling Daewoo cars in the United States.

Daewoo America then sued GM and others asserting several disparate claims, including fraud, tortuous interference with prospective economic advantage, and unjust enrichment. GM moved to dismiss this lawsuit relying on principles of international comity. The District Court granted this motion and dismissed all claims, characterizing Daewoo America's claims as a strategy "to collaterally attack the entire Korean reorganization process and result." Daewoo Motor America, Inc., v. General Motors Corp., 315 B.R. 148, 161 (M.D. Fla. 2004).

On appeal, the Eleventh Circuit Court of Appeals affirmed the dismissal of the claims asserted by Daewoo America, resting on principles of international comity. Specifically, the appellate court found that the claims raised by Daewoo America "arise out of the same nucleus of operative facts considered by the Korean court" and that "Daewoo America cannot now collaterally attack that order by bringing claims against the recipients of the property transferred based on the approval of the Korean court." 459 F.3d 1249, 1259.

Although the Eleventh Circuit Court of Appeals did not engage in a traditional res judicata analysis, it clearly found that the Korean bankruptcy court necessarily considered and approved the *entire* agreement between GM and the debtor which encompassed not only the future distribution rights but the purchase of Daewoo Korea. Because the claims in Daewoo America's complaint sought to redistribute assets previously transferred with the approval of the Korean court, the claims were "inextricably intertwined" with the order entered by the Korean court. 459 F.3d at 1260. The appellate court specifically found that Daewoo America, who actively participated in the bankruptcy case and who had knowledge of the terms of the agreement, failed to timely object to the confirmation, and was forever barred from collaterally attacking the terms of the agreement between GM and Daewoo Korea. The appellate court then found that our federal courts should abide by and enforce this decision of the Korean court out of the principles of international comity.

Because the terms of the agreement between GM and Daewoo Korea were critical and necessary to the debtor's modified plan of reorganization, the Korean bankruptcy court necessarily considered and approved those terms when it confirmed the plan. The court did not specifically consider the impact of the implementation of the agreement on the debtor's subsidiary, Daewoo America, because Daewoo America did not bring it to the court's attention. Indeed, Daewoo America was fully aware that the debtor's agreement with GM would shake the very core of Daewoo America's future business, yet it made no attempt to protect its interests or to assert any position in the bankruptcy case in regards to GM's controlling the future vehicle distribution rights. Therefore, Daewoo America could not later collaterally attack this portion of the agreement in a different forum. The claim was barred.

The decision in Daewoo is similar in many ways to the two other decisions of the Eleventh Circuit Court of Appeals in Atlanta Retail and Piper Aircraft, which both involved non-

debtor parties based in the United States and which raised classic issues of res judicata. In both of these cases, the non-debtor party was suing another non-debtor party for a claim that was related to the earlier bankruptcy proceeding. However, the significant difference is that in these two cases, the claim asserted in the later litigation was only indirectly and tangentially related to the claims decided by the bankruptcy court. As such, res judicata did not bar the later litigation from continuing.

In <u>Atlanta Retail</u>, the debtor operated a large retail camera and photographic supply business. Both Eastman Kodak Company and Wachovia Bank lent the debtor money. More significantly, Kodak had entered into two agreements with Wachovia, a Subordination Agreement and an Intercreditor Agreement. In a lawsuit filed after the bankruptcy court confirmed a plan of reorganization in the debtor's bankruptcy, Kodak alleges that Wachovia fraudulently induced Kodak into lending the debtor $30 million on the eve of bankruptcy in violation of the agreements between them. Wachovia asserted this post-confirmation litigation was barred by the terms of the confirmation order.

The Eleventh Circuit Court of Appeals held that the bankruptcy case "did not involve the same nucleus of operative facts" presented in Kodak's post-bankruptcy litigation and, further, that, even if Kodak *could* have raised its claims against Wachovia in the bankruptcy, "Kodak could not have received a full remedy." <u>Atlanta Retail</u>, 456 F.3d at 1280. In reaching this ruling, the appellate court explained that the bankruptcy court never considered nor needed to consider any breach of the agreements between Kodak and Wachovia. As such, the dispute between the two creditors could continue in the non-bankruptcy forum.

The Eleventh Circuit Court of Appeals reached a similar conclusion in <u>Piper Aircraft</u>. In <u>Piper</u>, the major creditor of the Chapter 11 debtor, Teledyne Industries, Inc., entered into a Cooperation Agreement with Kaiser Aerospace and Electronics Corp. to act as joint proponents

of a plan to buy the debtor's assets. Pursuant to this agreement, both Kaiser and Teledyne would have a specified equity ownership interest in the newly formed acquiring company. However, the Kaiser/Teledyne plan did not succeed. Instead, Teledyne partnered with another purchaser and ended up buying the debtor's assets under a confirmed plan of reorganization. Prior to the entry of the confirmation order, Kaiser already had sued Teledyne in a state court action asserting a violation of the Cooperation Agreement. However, neither Teledyne nor Kaiser informed the bankruptcy court of the pending state court action or the brewing dispute between Teledyne and Kaiser over equity ownership. As such, the bankruptcy court never considered any aspect of the dispute when it confirmed the debtor's plan to sell its assets to Teledyne.

Nor did the bankruptcy court need to consider Kaiser's lawsuit against Teledyne in connection with confirmation. When a debtor's assets are sold to a third party during a bankruptcy proceeding, it will not necessarily operate to bar each and every claim that could be asserted between non-debtors tangentially involving the property sold. The dispute between Kaiser and Teledyne simply did not arise out of the same nucleus of operative facts decided by the bankruptcy court at the confirmation hearing, nor would it have merited consideration in connection with any of the confirmation factors bankruptcy courts must consider pursuant to Bankruptcy Code Section 1129.[4] In explaining a bankruptcy court's scope of review in deciding whether to confirm a plan of reorganization, the Eleventh Circuit Court of Appeals explained:

> The confirmation process in a Chapter 11 case is primarily an inquiry into the viability of the proposed plan and the disposition of the debtor's assets, not the conduct of unrelated third parties, let alone third parties such as Kaiser that are not creditors and have no prior relationship with the debtor. The Bankruptcy Code, at 11 U.S.C. Section 1129(a), sets forth the criteria that a court must consider in deciding whether to confirm a plan. Facts relating to these

---

[4] Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

>    criteria are the only facts that necessarily are put at issue by
>    the confirmation process.

Piper Aircraft, 244 F.3d at 1300.

In determining that the dispute between Kaiser and Teledyne was not relevant to any of the confirmation factors considered by the bankruptcy court, the Court concluded that even the determination that Teledyne was a good-faith purchaser did not require the bankruptcy court to necessarily consider the manner in which Teledyne may have squeezed Kaiser out of an ownership interest. Rather, the "good-faith" inquiry for purposes of confirming a Chapter 11 plan requires the bankruptcy court to focus on the terms of the plan itself and the totality of the circumstances surrounding the plan. McCormick v. Banc One Leasing Corp., 49 F.3d 1524, 1526 (11th Cir. 1995). The bankruptcy court certainly had no obligation to delve into the past business relationship between Kaiser and Teledyne, "two potential third-party bidders," in deciding to confirm the plan. Piper Aircraft, 244 F.3d at 1300. Further, neither of the parties raised the issue to the bankruptcy court. As such, Teledyne could not claim any collateral bar to the later litigation.

The decision in Piper Aircraft is particularly analogous to the current dispute between WCI and Wright. Here, Wright convinced a representative of WCI to sign the Confidentiality Agreement months prior to Lost Key filing this Chapter 11 case. WCI was not then interested in buying the Property, and, with the departure of the two WCI employees with knowledge of the Confidentiality Agreement, probably did not know of the existence of the agreement when, after the bankruptcy filing, Champion approached WCI about buying the Property.

By the time of the confirmation hearing on the debtor's Third Amended Plan on October 9, 2003, however, both the debtor and WCI knew about the existence of the Confidentiality Agreement. WCI had a copy of the agreement. However, no party informed the Court of the existence of the Confidentiality Agreement, and Wright took no action to try to stop the sale of

the Property to WCI. As such, the Court must assume they did not think the agreement's existence impacted confirmation or WCI's decision to proceed forward with the sale.

Wright admittedly wore many hats during the pendency of Lost Key's bankruptcy. He was a broker for the debtor. He was affiliated with more than one potential purchaser of the Property and expected to receive an equity position with the acquiring entity. He also was related to an entity that purchased a large secured debt encumbering the Property. Without doubt, Wright was involved in many of the behind-the-scenes negotiations throughout this case.

However, Wright was not a creditor in the case. He never actually acquired any ownership interest in the Property or any equity position with any buyer. He primarily is a disgruntled broker who had hoped for an equity interest in the debtor and who is now trying to recover something from WCI for all of his efforts.

Wright's claims for damages/unjust enrichment against WCI are not barred by the entry of the confirmation order in the debtor's bankruptcy case. The claims alleged by Wright are based on WCI's alleged breach of the Confidentiality Agreement it entered into with Wright prior to the time the debtor filed this bankruptcy case. The debtor was not a party to the agreement. WCI is a non-debtor entity who simply happens to have been the entity purchasing the Property. Whether WCI may have to pay damages to Wright for its alleged breach of the Confidentiality Agreement would have had no bearing on confirmation, although it may alter the amount WCI ultimately pays to acquire the Property. Again, Wright is only seeking damages for being cut out of the sale of the Property, he is not seeking to undo the sale of the Property. This difference is significant. Wright's damages claims are only tangentially related to the sale of the Property.

The purpose of the confirmation process is to inquire into the viability of the plan, "not the conduct of unrelated third parties." Piper Aircraft, 244 F.3d at 1300. In this case, the confirmation analysis was easy. The Third Amended Plan was a liquidating plan that merely required the Court to consider whether WCI could pay $25 million or not. No one suggested WCI lacked this financial ability, and, indeed, later events proved WCI was financially able to fund the plan. Creditors were paid in full, and a substantial distribution went to equity interest holders. The fact that WCI may have a separate liability to Wright under the Confidentiality Agreement was not relevant to the Court's determination to confirm the plan at the time or now.

Nor was the Court's finding that WCI was a good-faith purchaser a ground to later bar Wright from suing WCI under the Confidentiality Agreement. The good-faith inquiry merely requires the Court to analyze the terms of the plan, the circumstances surrounding the plan, and whether the plan was proposed in good faith. The analysis does not require a bankruptcy court to delve into past business relationships between Wright and WCI, as competing purchasers.

Accordingly, the Court finds that Wright's claims against WCI arising under the Confidentiality Agreement do not involve the same nucleus of operative facts as those considered during the confirmation process or that resulted in the Confirmation Order. Moreover, even though the claims are between two parties involved in Lost Key's Chapter 11 case, the determination of the liability, if any, of WCI to Wright was not a factor necessary for the Court to consider or that necessarily should have been raised by the parties prior to confirming the Third Amended Plan. As such, res judicata does not bar Wright from continuing with his litigation against WCI on the Confidentiality Agreement.

For these reasons, the Court will grant Wright's motion for summary judgment and deny WCI's cross motion for summary judgment. A separate order consistent with this Memorandum Opinion shall be entered.

DONE AND ORDERED in Orlando, Florida, on the 30th day of March, 2007.

KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies provided to:

Plaintiff: WCI Communities, Inc., c/o John A. Anthony, 201 N. Franklin Street, Suite 2200, Tampa, FL  33602

Plaintiff's Counsel: Jason A. Rosenthal, 212 Pasadena Place, Suite A, Orlando, FL  32803

Defendant: Roderic M. Wright, P.O. Box 1848, Destin, FL  32540

Defendant's Counsel: Alan C. Watkins, 707 North Franklin Street, Suite 750, Tampa, FL 33602